### STANDARD OIL CO. OF INDIANA v. AMIESITE ASPHALT CO. OF KANSAS CITY.

Circuit Court of Appeals, Eighth Circuit.
April 3, 1928.

No. 7883.

Trial ⬤⟲252(13)—Submission of cause to jury on an issue as to breach of warranty, not warranted by the evidence, held error.

Where the evidence showed without contradiction that two cars of asphalt delivered by defendant to plaintiff conformed to the specifications of a written contract between the parties for a large number of carloads, it was error to submit an action for damages for breach of warranty to the jury on a contention by plaintiff that the two cars were delivered under a subsequent oral contract containing a warranty of fitness for the use intended, which claim was clearly unsupported by the evidence.

In Error to the District Court of the United States for the Western District of Missouri; Merrill E. Otis, Judge.

At Law. Action by the Amiesite Asphalt Company of Kansas City against the Standard Oil Company of Indiana. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

R. R. Brewster, of Kansas City, Mo. (William B. Bostian, of Kansas City, Mo., on the brief), for plaintiff in error.

Redmond S. Brennan, of Kansas City, Mo. (Lloyd R. Fraker, of Kansas City, Mo., on the brief), for defendant in error.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. Defendant in error, hereinafter designated as plaintiff, is a Missouri corporation engaged, at Kansas City, Mo., in the business of manufacturing, compounding, and selling material for use in the construction of paved roadways. In this material, known as Amiesite, asphalt is an essential constituent. Prior to July 7, 1925, plaintiff had been using a Mexican asphalt called "Norco," a New Orleans Mexican Company product. On that date it entered into a written contract with the plaintiff in error, hereinafter designated as defendant, whereby it agreed to buy from defendant such petroleum products therein named as it might need for use in its plant or plants at Kansas City from July 6, 1925, until December 31, 1925. The products named are thus specifically described:

"Quantity.                              Price.
"850 Tons 80–90 penetration Stanolind paving asphalt..................... $18.50
          "F. o. b. Sugar Creek.
"(80–90 penetration Stanolind paving asphalt to be obtained from Wood River, Ill., at $18.50 per ton f. o. b. Wood River until July 20, 1925.)"

The seller agreed to furnish the products named on the terms and at the price stated, guaranteeing the same to be uniform in quality and at all times up to its (defendant's)

standards. Plaintiff's reasons for entering into this contract are thus stated by its president: "I wanted to buy Standard asphalt for this reason: That they have a general sales organization, and they stated, if I would buy Standard, they would promote the sale of my manufactured product. The people that I was buying from had no sales organization. * * * There was this further benefit buying from the Standard; they had a plant at Sugar Creek. I was buying from New Orleans. I could get two days' service from Sugar Creek, and it took nine to ten days from New Orleans."

Sugar Creek is near Kansas City, and the reduced freight charge was an additional consideration. The contract provided for supply from Wood River, Ill., for a brief period until the Sugar Creek plant should be in full operation. With that provision we are not here concerned. Two cars were shipped by defendant from Sugar Creek, and it is claimed by plaintiff that the asphalt product delivered would not cohere with the other material employed in the Amiesite process, and that the resulting mixture was a failure for paving purposes. There was much testimony to support this allegation. Whether this failure was due to inherent defect in the asphalt, or to change in plaintiff's mixing process, whereby the asphalt was rendered more fluid by the addition of a lighter oil as a liquifier, was a matter of conflict in the testimony, apparently resolved against defendant by the jury.

In its petition plaintiff charged generally that at the sale of these cars defendant warranted the same to be as good or better than the Mexican asphalt which had previously been used by the Amiesite Company, and that, with knowledge of the nature of plaintiff's business, defendant warranted the asphalt it was selling to be adapted to the purposes for which the product was being bought and used. It was alleged by plaintiff that the asphalt purchased of the Standard Company was a failure for paving purposes; that plaintiff lost what it had paid for the asphalt, for the materials used in the mixture, its expense in disposing of what was left on hand, and the demurrage paid on cars of Mexican asphalt, which could not be unloaded until the alleged worthless material had thus been removed. The suit originally was for $8,856.42.

The defendant oil company by its answer stated that the asphalt was sold under a written contract which provided for the sale of 850 tons 80–90 penetration Stanolind paving asphalt, price $18.50 f. o. b. Sugar Creek. It further alleged that the two cars in question were furnished under this written contract, which contained no warranty of the nature sued on. It also interposed a counterclaim, about which there is no dispute, and which need not further be considered. To this answer no reply was filed; but at the trial it was contended that, having heard that a car of this same character of asphalt, shipped to Kansas City, Kan., had been found to be unadapted to the purpose for which it was shipped, plaintiff advised the oil company that it would not accept shipments under the contract; that thereafter it was assured by the sales agent of defendant that the asphalt was guaranteed or warranted to do the work required; that plaintiff was thereby induced to enter upon what it termed a new contract to buy two cars under this warranty and entirely independently of the original written contract. It therefore sued for breach of warranty alleged to be contained in this later contract. The court's charge embraced a submission of this theory of plaintiff. The jury returned a verdict for plaintiff in the sum of $5,697.47, to be reduced, however, by $810.85 found by agreement on the counterclaim of defendant.

The written contract does not embrace the warranty sued on. Plaintiff's right to recover depends upon the establishment of a new oral contract which it alleges superseded and displaced the written contract and which is alleged to have contained that warranty. The evidence upon which plaintiff's contention is based is substantially as follows:

Some time after the written contract was executed the plainttiff company heard that a car of defendant's asphalt, shipped to Kansas City, Kan., had proved unsatisfactory for the paving purposes for which it was intended. It does not appear that the Kansas City, Kan., paving was to be laid under the Amiesite process. Mr. Kealy, plaintiff's president, left Kansas City on his wedding trip July 13, 1925, returning July 22d or 23d. Meantime defendant was on the point of shipping to plaintiff from Sugar Creek two cars of asphalt, one for Fortieth and Summit streets, in Kansas City, Mo., and one to Lees Summit, Mo. In the absence of its president, plaintiff objected to receiving these cars from Sugar Creek, because, as stated above, it had heard that a car shipped from Sugar Creek had not given satisfaction in Kansas City, Kan. The officers in charge of the plaintiff company insisted that the matter be held in abeyance until the return of its president. After Mr. Kealy's return,

the substance of what took place is disclosed by the following excerpts from his testimony:

"Q. Let me ask you, then, to further refresh your recollection, that, after having this matter brought to your attention, this matter at Kansas City, Kan., you did not get into communication with the Standard Oil Company, and if at your instance and request a test was not made of the asphalt by the Kansas City testing laboratory? A. Yes; that was after the Kansas matter was brought to my attention.

"Q. Yes; that is, after the Kansas matter was brought to your attention, you then took it up with the Standard Oil Company? A. Yes, sir; about Sugar Creek shipments.

"Q. And they told you—you said you wanted a test made on it, and they told you that all material that went out of the refinery was tested, and you then stated there had been some observation made to you about that from Sugar Creek? A. Yes, sir.

"Q. That observation came from whom, Colonel? A. From the parties; well, the name of the individual was Mr. Rodebusch. He was the contractor.

"Q. So you then asked if there could not be an independent analysis made, and they agreed to it, and you picked the Kansas City laboratory; is that correct? A. I think that is correct. * * *

"Q. And you did later hear of the test? A. Later on they called me, and I talked over the 'phone with the representative of the laboratory.

"Q. When you talked to the chemist, he told you what it showed? A. He told me of the penetration, and he told me of the ductility, and I think those were the only two.

"Q. Now, whatever he told you what his test was, it was so satisfactory to you that you then said to them—on with the shipment? A. That is correct.

"Q. That is correct, and in doing that you, of course, relied upon the fact that you believed he was giving you a correct analysis of it? A. Well, it was a very superficial analysis; that is penetration and ductility, or a very small part.

"Q. You asked for that analysis? A. Yes, sir.

"Q. And you got the analysis you asked for? A. Part of it; it takes several days to make it complete.

"Q. Anyway, after he told you what the analysis showed, you said that the test was satisfactory—that it was satisfactory—and ordered the cars shipped? A. I asked them to let it come on; yes."

The witness further stated that it would

have taken but 24 hours longer to make a complete test of all qualities of asphalt; that what he wanted was 80 or 90 penetration Stanolind paving asphalt; that asphalt is customarily purchased as of a certain penetration and a certain ductility. Penetration, as defined by the expert witnesses, is the distance or depth that "a needle under a given load at a given temperature will penetrate into the asphalt." Ductility is the distance that a tube of asphalt "will elongate at certain temperature under a given pull, pulling it at a certain rate." From these qualities result the degree of "stickiness" or holding power of the asphalt. Mr. Means, research chemist for defendant, states that the controlling test of asphalt is as to ductility, penetration, and the incidental melting point.

Mr. Skorrup, sales agent of defendant at Kansas City, testified as follows:

"Q. Do you know about the testing of this asphalt by the Kansas City laboratory? A. Yes, sir.

"Q. Do you know how that came about? A. It came about through the fact that there was a question raised as to whether our test would be o. k. or not.

"Q. Who raised that question? A. I could not state positively whether Mr. Kealy or Mr. Van Buskirk.

"Q. And who did they raise it with? A. I think me personally.

"Q. Now, what arrangement was made about having it tested? A. The arrangement made to have it tested, the shipment was not to be made until approved by the laboratory, until they made a test on it, and—

"Q. Now, who chose the Kansas City testing laboratory? A. I couldn't state who chose it, but I know it was mutually agreed it was satisfactory.

"Q. And did they make the test? A. Yes, sir. * * *

"Q. Were you present at the Kansas City laboratory after it made its test? A. Yes, sir.

"Q. And did you talk to Colonel Kealy after those tests were made? A. Yes, sir.

"Q. Did the chemist who made the test report to Colonel Kealy? A. Mr. Hawthorne reported to Colonel Kealy.

"Q. And after he reported did you talk to Colonel Kealy? A. Yes, sir.

"Q. What did he say to you? A. He said those specifications are all right—tests are all right. 'How soon could you move a car?' and I stated I would call Sugar Creek immediately.

"Q. Did you do so? A. Yes, sir.

"Q. And the cars came forward? A. Yes, sir."

Mr. Hawthorne, chemist of the Kansas City testing laboratory, gave the following testimony:

"Q. Going back, now, to the examination that you made of this sample of asphalt that came—that was brought to you, did you after examining it talk to Colonel Kealy? A. Yes, sir; I did.

"Q. And what did you say to him and what did he say to you? A. I talked to Colonel Kealy on the telephone, and he asked me what the tests were, and I reported the melting point and penetration of ductility to him, and he then told me what their specifications were, for asphalt, and asked me if that asphalt complied with these specifications, and I told him that they did, the asphalt did.

"Q. Now, and then did he talk with one of the Standard Oil men? A. Yes, sir; I think he talked with Mr. Skorrup.

"Q. What did you say the penetration of this sample was? A. This sample was 87."

The tests made by the chemists of the Standard and of the testing laboratory are in substantial agreement. They bring the asphalt in controversy within the terms and specifications of the written contract, and in fact within the specifications of the Amiesite Company, as those specifications were stated by Mr. Kealy to Hawthorne.

In the light of the entire record, there is no substantial conflict as to what took place. The plaintiff company, because of what it had heard of the experience with this asphalt in Kansas City, Kan., hesitated, in the absence of its president, to receive the two cars which defendant was about to ship under the written contract. No doubt the local employees of defendant attempted to reassure plaintiff, and may have indulged in the trade puffing common to salesmanship.

Skorrup, the Standard agent, testified:

"Q. Did you or did you not represent to Colonel Kealy that the Standard Oil Company was going to manufacture out of Sugar Creek an asphalt that would take the place of the Mexican asphalt that he was using? A. No; not in that way; no, sir.

"Q. Just tell us in what way you did represent? A. I represented that Standard Oil paving asphalt would give service and wear in pavement, in asphalt pavements.

"Q. Didn't you say a little more than that —that it would give as good service as Mexican asphalt he was using? A. Not to my knowledge; no, sir. * * *

"Q. So do you want this jury to take your testimony to be that you called in there, and he placed an order with you without any representation from you that it would stand up the same? A. I sold him on the quality of the Standard Oil pavement asphalt.

"Q. What is the name of that? A. Stanolind."

Of course, all representations made when the written contract was executed were merged in that contract, and the subsequent statements alleged could have no effect to inject into that contract a warranty not embraced within its terms. Counsel for plaintiff conceded this by their claim of novation in the nature of a subsequent oral contract. Upon Mr. Kealy's return to Kansas City, about July 22d or 23d, the doubts existing were, at his request, to be resolved by submission for test to an independent and disinterested chemical laboratory; that test disclosed that the product conformed to the specifications of the written contract. The defendant agreed to sell and the plaintiff to buy Stanolind paving asphalt of 80 to 90 penetration, and such this asphalt proved to be according to the independent chemical authority agreed upon and accepted. Pursuant to that decision, plaintiff ordered the cars to "come on"—obviously under the existing written contract. There was no substantial legal evidence of the existence of the oral contract sued on. To the charge seasonable exception was not preserved; however, the court submitted the case upon an issue not warranted by the record. The motion for a directed verdict upon the evidence presented should have been sustained. For the error committed in overruling that motion, the judgment must be reversed, and the case remanded for a new trial.

It is so ordered.